UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| JAMES KYLE GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:15-CV-00180-MGG |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff James Kyle Green ("Green") filed his complaint in this Court seeking reversal and remand of the Social Security Commissioner's final decision to deny his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. For the reasons discussed below, this Court reverses and remands the Commissioner's final decision.

**I.    PROCEDURE**

On September 12, 2012, Green filed an application for SSI, alleging disability beginning September 12, 2012. The Social Security Administration ("SSA") denied Green's application initially on November 13, 2012, and upon reconsideration on March 8, 2013. On November 21, 2013, a hearing was held before an administrative law judge ("ALJ") where Green and an impartial vocational expert ("VE") appeared and testified. On January 27, 2014, the ALJ issued his decision finding that Green was not disabled at Step Five of the evaluation process and denied Green's application for SSI. On February 20, 2015, the Appeals Council denied Green's request for review, making the ALJ's decision the final decision of the Commissioner.

On April 23, 2015, Green filed a complaint in this Court seeking reversal or remand of the Commissioner's decision. On October 16, 2015, Green filed his opening brief. Thereafter, on January 22, 2016, the Commissioner filed a responsive memorandum asking the Court to affirm the decision denying Green benefits. Green filed his reply brief on April 4, 2016. The Court may enter a ruling in this matter based on the parties' consent pursuant to 42 U.S.C. § 405(g); 28 U.S.C. § 636(c)(1).

## II.    RELEVANT BACKGROUND

### A.    Plaintiff's Testimony

Green was born on April 13, 1993. He graduated from high school and has no relevant work experience. He was 19 years old at the time of the alleged onset date of September 12, 2012. Green alleged the impairments of cystic fibrosis, vitamin D deficiency, hypertension, gastroesophageal reflux disease, bronchial asthma, status post G-tube placement because of poor weight gain, malabsorption, malnutrition, and depression. He admitted that he was not going to school or working because his parents were afraid that it would hurt his chances of getting disability benefits.

Around the time of the application date, Green denied any labored breathing at rest, with exercise, or a cough, and he reported feeling well. Green alleged at one time that it was difficult for him to perform everyday tasks without losing his breath, such as walking, climbing stairs, and vacuuming. During a telephone interview, however, he admitted to an ability to do all of those things with no problem. In addition, Green indicated that he could play 18 holes of golf with his dad one to two times a week if he could rest in the cart. Green also reported needing bathroom breaks eight to nine times a day. Green also claimed that he had stools five to six

times a day in August 2012, but that he had improved to stools just two to three times a day by January 2013.

>    B.    **Medical Evidence**

Green was diagnosed with cystic fibrosis at three months of age. X-rays of his chest revealed changes consistent with cystic fibrosis. Green had a gastric tube ("G-tube") implanted sometime around 2010 to assist with his feeding and nutrition. After his application date, but before the ALJ's decision, Green was hospitalized four times, due to cystic fibrosis exacerbations for periods of approximately 14 days each undergoing extensive treatment. Even with the G-tube, Green continued to experience malabsorption, malnutrition, and poor weight gain.

In October of 2012, Dr. S. Vemulapalli examined Green at the behest of Social Security. Dr. Vemulapalli found him positive for respiratory, gastrointestinal, and immunologic problems. On physical exam Green weighed 133.8 pounds and was 67 inches tall.

In December of 2013, Dr. P. James, Green's pulmonologist, wrote a letter to Social Security describing chronic fibrosis as an inherited, life-threatening disease affecting multiple organs, especially the lungs and digestive system. In earlier notes, he opined that cystic fibrosis patients often require longer more frequent bathroom breaks. Dr. James indicated that Green spends up to 45 minutes in the bathroom, but not how often Green normally spends in the bathroom. In October 2013, Dr. James indicated that Green could go to trade school and get a job.

### C. The ALJ's Determination

After the hearing, the ALJ issued a written decision reflecting the following findings based on the five-step disability evaluation prescribed in the SSA's regulations.[1] At Step One, the ALJ found that Green had not engaged in substantial gainful activity since September 12, 2012, the application date. At Step Two, the ALJ found that Green's cystic fibrosis, hypertension, and underweight status constituted severe impairments. The ALJ found that Green's alleged depression caused no more than a minimal limitation on his ability to engage in basic work activities and was therefore not severe. At Step Three, the ALJ gave a six line analysis finding that Green's impairments did not meet or equal a Listing.

Before proceeding to Step Four, the ALJ determined Green's residual functional capacity ("RFC"). The ALJ found that Green's overall level of functioning suggested that his impairment was not as severe as alleged. The ALJ reviewed the medical evidence and concluded that Green's physical impairments, while severe, did not prevent him from meeting the exertional requirements of sedentary work as defined in 20 C.F.R. § 416.967(a), with a few additional limitations. Specifically, the ALJ concluded that Green had the ability to

> lift 10 pounds occasionally, stand and/or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday with normal breaks. [Green] can occasionally climb ramps or stairs, but he can never climb ladders, ropes, or scaffolds. [Green] can occasionally balance, stoop, kneel, crouch, or crawl.

Doc. 11 at 25. The ALJ also incorporated the following limitations into Green's RFC:

> [Green] requires an environment where he will not be exposed to even moderate levels of environmental irritants such as fumes, odors, dusts, or gases (i.e. office type settings). [Green] requires a job that will provide for a lunch break of one hour, but he otherwise requires only standard breaks (i.e. a break in the morning and a break in the afternoon).

---

[1] *See* 20 C.F.R. § 416.920(a)(4)(i)-(v). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001); *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

4

*Id.* At Step Four, the ALJ found that Green had no past relevant work. At Step Five, the ALJ considered Green's age, education, work experience, and RFC and determined that Green was able to perform a significant number of jobs in the national economy, including becoming an addresser, charge account clerk, or a surveillance system monitor.

Based on these findings, the ALJ determined in his January 27, 2014, written decision that Green had not been under a disability from September 12, 2012. Green requested that the Appeals Council review the ALJ's decision, and on February 20, 2015, the Council denied review, making it the Commissioner's final decision. *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005); 20 C.F.R. § 416.1481.

## III. ANALYSIS

### A. Standard of Review

On judicial review, under the Social Security Act, the Court must accept that the Commissioner's factual findings are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, substantial evidence is simply "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).

A court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility or substitute its

5

judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Thus, the question upon judicial review is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

Minimally, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). However, the ALJ need not specifically address every piece of evidence in the record, but must present a "logical bridge" from the evidence to his conclusions. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). The ALJ must provide a glimpse into the reasoning behind his analysis and the decision to deny benefits. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001).

B.  **Issues for Review**

Green seeks reversal or remand of the ALJ's decision, arguing that there was evidence that Green met Listings 3.04B (Cystic Fibrosis) and 5.08 (Weight loss due to any digestive disorder), and that the ALJ's Step Three analysis was perfunctory. In other words, Green argues that the ALJ failed to articulate a "logical bridge" between the evidence and his conclusion that none of Green's severe impairments met or medically equaled a Listing at Step Three. Green also contends that the ALJ improperly evaluated his symptom testimony in the RFC analysis.

1.  **Step Three Analysis**

At Step Three, the ALJ must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria or an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. 20 CFR § 416.920(d), 416.925, 416.926. If the claimant's impairment or combination of impairments is of a severity to meet or

medically equal the criteria of a Listing and meets the duration requirement established in 20 CFR § 416.909, the claimant is disabled. If not, the ALJ proceeds to the next step of the disability analysis.

In this case, the ALJ's Step Three analysis is very brief and follows in its entirety.

> The claimant's attorney did not argue that the claimant's impairments met or equaled a listing. Moreover, no treating physician or examining physician has indicated diagnostic findings that would satisfy any listed impairment. After independently considering the listings, and specifically listings 3.02, 3.03, 3.04, 4.00 and 12.04, the undersigned finds that the claimant's impairments, either separately or in combination, do not medically meet or equal the criteria of any listed impairment. The listings have threshold requirements that are not met in the instant case.

Doc. 11 at 24. In the ALJ's opinion, Listing 3.04 receives the barest of mentions, and Listing 5.08 is not mentioned at all giving rise to Green's arguments for reversal or remand as discussed below.

### a. The ALJ's Listing 3.04B Analysis

Green argues that remand is appropriate because he met the requirements of Listing 3.04B and therefore should have been found disabled and eligible for SSI. Listing 3.04B, for cystic fibrosis, reads:

> *Episodes of bronchitis or pneumonia or hemoptysis* (more than bloodstreaked sputum) or respiratory failure (documented according to Section 3.00C, requiring physician intervention, occurring at least once every 2 months or at least 6 times a year. Each inpatient hospitalization for longer than 24 hours per treatment counts as 2 episodes, and an evaluation period of at least 12 consecutive months must be used to determine frequency of episodes. . . .

20 C.F.R. pt. 404, subpt. P, app. 1 § 3.04B.[2] Section 3.00C defines "episodic respiratory disease" as follows:

---

[2] The language of 3.04B has been updated, since the time of the ALJ's decision to require only "three hospitalizations of any length within a 12–month period and at least 30 days apart." The listings changed October 7, 2016. 81 FR 37138. Because the ALJ issued his opinion regarding Green's disability application before the new wording took effect, the Court here will apply the old standards.

7

> When a respiratory impairment is episodic in nature, as can occur with exacerbations of . . . cystic fibrosis . . . , the frequency and intensity of episodes that occur despite prescribed treatment are often the major criteria for determining the level of impairment. Documentation for these exacerbations should include available hospital, emergency facility and/or physician records indicating the dates of treatment; clinical and laboratory findings on presentation, such as the results of spirometry and arterial blood gas studies (ABGS); the treatment administered; the time period required for treatment; and a clinical response. Attacks of asthma, episodes of bronchitis or pneumonia or hemoptysis (more than bloodstreaked sputum), or respiratory failure as referred to in paragraph B of 3.03, 3.04, and 3.07, are defined as prolonged symptomatic episodes lasting 1 or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours. The medical evidence must also include information documenting adherence to prescribed regimen of treatment as well as the description of physical signs.

Therefore, Green effectively summarizes the elements necessary for the ALJ to find that his cystic fibrosis meets or medically equals Listing 3.04B when he states that he must establish (1) a cystic fibrosis diagnosis; (2) episodes of bronchitis or pneumonia or hemoptysis or respiratory failure; (3) adherence to prescribed treatment; (4) physician intervention for intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy; and (5) episodes occurring every 2 months or at least 6 times per year (a hospitalization for more than 24 hours counts as 2 episodes) during a period of 12 consecutive months with each impatient hospitalization longer than 24 hours. (Doc. 21 at 8).

In support of his argument that he has met all the elements of Listing 3.04B, Green references the following evidence in the record before the ALJ and now this Court. First, Green relies on the ALJ's conclusion that his cystic fibrosis constituted a severe impairment to confirm his cystic fibrosis diagnosis. Second, Green cites multiple medical records to show that he has had episodes of bronchitis or pneumonia or hemoptysis or respiratory failure. Specifically, Green references Dr. James's reports during (1) a chest x-ray in October 2012 showing abnormal

8

thickening of the bronchial walls and damage and lung infection (Doc. 11 at 460); (2) a November 2012 office visit showing weight loss and a drop in spirometry[3] (Doc. No. 11 at 457); (3) a hospitalization in March 2013 during which Green experienced congestion and coughing, a drop in spirometry, and mild clubbing[4] (Doc. 11 at 519); (4) an August 2013 hospitalization noting a significant drop in spirometry and weight (Doc. 11 at 502); and (5) an October 2013 hospitalization when Green had suffered weight loss, increased cough, shortness of breath, and mild clubbing. (Doc. 11 at 548-49).

Third, Green makes colorable claims that he was compliant with treatment citing (1) treatment notes from his November 2012 hospitalization, which state that his aunt and uncle had been monitoring Green's compliance with therapy (Doc. 11 at 457); (2) notes from his March 2013 hospitalization indicating that he had been in for treatment a couple of months before and on the day of his admission (Doc. 11 at 519); and (3) the intake form for his August 2013 hospitalization noting that he not been taking his tube feedings regularly, but that he had otherwise adhered to treatment (Doc. 11 at 506). Green also explained upon admission to his October 2013 hospitalization that he had some problems with insurance preventing him from receiving one of his main medications since September and receiving a tube feeding for two weeks. (Doc. 11 at 548).

Fourth, Green cites multiple medical records to show that he received intensive treatment, including IV antibiotics, albuterol treatments, and a therapy vest four times a day, during each of

---

[3] "Spirometry (spy-ROM-uh-tree) is a common office test used to assess how well your lungs work by measuring how much air you inhale, how much you exhale and how quickly you exhale. Spirometry is used to diagnose asthma, chronic obstructive pulmonary disease (COPD) and other conditions that affect breathing." Mayo Clinic, Tests and Procedures: Spirometry, http://www.mayoclinic.org/tests-procedures/spirometry/basics/definition/prc-20012673 (last visited Nov. 4, 2016).

[4] "Clubbing of the fingers, in which the fingertips spread out and become rounder than normal, is often linked to heart or lung conditions." Mayo Clinic, Healthy Lifestyle: Adult health, http://www.mayoclinic.org/healthy-lifestyle/adult-health/multimedia/clubbing-of-fingers/img-20005724 (last visited Nov. 4 2016).

his hospitalizations between November 27, 2012, and November 4, 2013. (Doc. 11 at 460, 506, 523, 551). Fifth, Green argues that he has met the requirement for frequent episodes with his four hospitalizations, all of which fell within a single year, and each of which lasted approximately 14 days. (*Id.*). As such, Green contends that he had a total of eight episodes because each of the hospitalizations was for more than 24 hours and counts as two episodes under the language of Listing 3.04B.

The Commissioner all but concedes that Green's cystic fibrosis met every requirement in Listing 3.04B, except adherence with treatment. (Doc. 26 at 4). In essence, the Commissioner seems to argue that it was Green's noncompliance with his treatment regimen that caused his four hospitalizations. In support, the Commissioner indicates that the ALJ explicitly noted that Green's FEV1 values improved during each of his hospitalization due to cystic fibrosis exacerbations. Yet, the ALJ's sole reliance on the improvement in Green's FEV1 values during his hospitalizations is not enough to conclude that the ALJ actually found Green noncompliant with treatment.

Looking beyond the ALJ's opinion to the record, the Commissioner also points to other evidence of nonadherence in an attempt to show that Green's cystic fibrosis could not satisfy the adherence prong of Listing 3.04B. For instance, the Commissioner noted a doctor's concern during Green's November 2012 hospitalization that Green's parents were not providing him with food. The Commissioner also referenced (1) Green's admission during his March 2013 hospitalization that he had stopped his tube feedings for two weeks; (2) the environmental irritants such as smoking and gas forced air heat in his home; and (3) notes during his October 2013 hospitalization that he had stopped taking his medication and stopped tube feedings again.

By presenting this Court with evidence from the record beyond that discussed by the ALJ in his opinion, both parties have raised the question of whether Green adhered with his treatment regimen sufficiently to meet the requirements of Listing 3.04B. Yet, the ALJ's perfunctory analysis simply does not reveal whether he evaluated any of the evidence cited here by the parties. More specifically, the ALJ made no mention of Green's nonadherence in his Listing analysis. As a result, the ALJ has not provided a logical bridge from the evidence to his conclusion that Listing 3.04 was not met. Therefore, remand is necessary to determine whether Green sufficiently adhered to his treatment regimen such that his cystic fibrosis meets or medically equals the requirements of Listing 3.04B.

### b. The ALJ's Listing 5.08 Analysis

Green also argues that the ALJ improperly evaluated whether he met or medically equaled the requirements of Listing 5.08 for weight loss due to any digestive disorder. Listing 5.08 states:

> Weight Loss due to any digestive disorder despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6-month period.

The ALJ made no mention of Listing 5.08 in his perfunctory Step Three analysis, quoted above, despite finding that Green's underweight status constituted a severe impairment at Step Two.

According to the applicable regulation,

> [t]he nonpulmonary aspects of cystic fibrosis should be evaluated under the [Listings related to the] digestive body system (5.00). Because cystic fibrosis may involve the respiratory and digestive body systems, the combined effects of the involvement of these body systems must be considered in case adjudication.

20 C.F.R. pt. 404, subpt. P, app. 1, § 3.00(D). Indeed, Green's own pulmonologist explained that cystic fibrosis affects multiple organs especially the lungs and digestive system because most

11

cystic fibrosis patients do not digest dietary fat or protein completely requiring them to take enzymes to help with absorption. (Doc. No. 11 at 545).

Despite, the apparent connection between cystic fibrosis and digestive disorders, the ALJ said nothing about a potential digestive disorder in his Step Three analysis. The ALJ did, however, discuss evidence in the record relevant to Listing 5.08 in his RFC analysis. For instance, the ALJ calculated Green's BMI relying solely on Green's testimony that he was five feet, six inches tall and weighed 108 or 109 pounds to find a body mass index ("BMI") of 17.4–17.6. Notably, a BMI of 17.4–17.6 is considered underweight in the *Clinical Guidelines* and straddles Listing 5.08's 17.5 line.

Yet, the ALJ did not account for Green's varying weights between 105 and 109 pounds over the course of the year of his alleged disability. Had he done so, the ALJ would have likely found that Green met Listing 5.08's weight requirement by having two subpar BMI calculations at least 60 days apart within a 6-month period. Moreover, Green has directed the Court's attention to evidence in the record showing other dates where Green's BMI was subpar on two occasions at least 60 days apart within a 6-month period. In addition, the ALJ's reliance on Green's testimony could be misplaced as it actually contradicts the report of consultative examiner, Dr. S. Vemulapalli, who found that Green was 5'7", an inch taller than Green stated. Without more from the ALJ, the Court cannot discern whether the ALJ discredited Dr. Vemulapalli's report, or any other weight evidence in the record, that could have affected Green's BMI calculation.

Once again, the Commissioner argues that the weight loss was a result of Green's noncompliance in treatment such that Green could not meet the requirements of Listing 5.08. The Commissioner similarly relies on the ALJ's opinion where he mentioned that Green's FEV1

values improved during each hospitalization to show noncompliance. In contrast, the ALJ seems to have inadvertently referenced Listing 5.08 when he stated that "[d]espite his G-tube, the claimant has continued to experience malabsorption, malnutrition, and poor weight gain." Doc. 11 at 26 (citing hospital records in 2012 and 2013).

Notwithstanding the Commissioner's arguments regarding noncompliance, the ALJ's very limited and potentially conflicting analysis of Green's weight loss in the RFC section rather than in his Step Three analysis leave the Court unable to discern whether the ALJ considered Green noncompliant with treatment, much less whether the ALJ thought noncompliance caused the weight loss such that Listing 5.08 would not apply.

As a result, the ALJ did not support his decision that Green's digestive issues arising from his cystic fibrosis did not meet or medically equal the requirements set forth in Listing 5.08 with substantial evidence.

The Court reaches no conclusion here on how the ALJ should interpret the evidence in the record. Instead, the Court remands for further evaluation and explanation of the decision.

### 2. RFC Analysis

If on remand the ALJ finds that Green meets or medically equals a Listing, he will be found disabled and the five-step disability determination analysis will end and Green will be entitled to SSI. On the other hand, should the ALJ find that Green does not meet a Listing, the ALJ will need to readdress Green's RFC before proceeding to Step Four and Step Five.

An individual's RFC demonstrates his ability to do physical and mental work activities on a sustained basis despite functional limitations caused by medically determinable impairments and their symptoms, including pain. 20 C.F.R. § 416.945; SSR 96-8p. In making a proper RFC determination, an ALJ must consider all of the relevant evidence in the case record, including

evidence of functional limitations resulting from nonsevere impairments. 20 C.F.R. § 415.20(e). The record may include medical signs, diagnostic findings, the claimant's statements about the severity and limitations of symptoms, statements and other information provided by treating or examining physicians and psychologists, third party witness reports, and any other relevant evidence. SSR 96-7p.[5]

It remains the claimant's responsibility to provide medical evidence showing how his impairments affect his functioning. 20 C.F.R. § 416.912(c). Therefore, when the record does not support specific physical or mental limitations or restrictions on a claimant's work-related activity, the ALJ must find that the claimant has no related functional limitations. SSR 96-8p. An ALJ need not mention every piece of evidence in the record, but must connect the evidence to the conclusion. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

### a. The ALJ's Lack of Reference to Green's Hospitalizations

Green challenges the RFC determination, arguing that the ALJ improperly evaluated Green's symptom testimony. (Doc. 21 at 11). In support, Green begins with references to his hospitalizations, arguing that they support his testimony that he had an average of two to three bad days a week. Accordingly, Green appears to be contending that his past hospitalizations show that his impairments would force him to be absent too much to sustain competitive employment.

Surprisingly, the ALJ's RFC analysis cites very little evidence in the record showing that Green was hospitalized four times for periods of approximately 14 days each over the course of a

---

[5] At the time of the ALJ's decision, credibility was assessed pursuant to SSR 96-7p. However, the SSA has recently updated its guidance about how to evaluate symptoms in disability claims by issuing SSR 16-3p. The new Ruling eliminates the term "credibility" from the SSA's sub-regulatory policies to "clarify that subjective symptoms evaluation is not an examination of the individual's character." SSR 16-3p. Nevertheless, because the ALJ issued his opinion regarding Green's disability application before SSR 16-3p was issued and took effect, the Court here will apply SSR 96-7p and use the term "credibility" accordingly in this order.

year running from November 27, 2012 to November 4, 2013. (Doc. 11 at 460, 506, 523, 551). In fact, the Commissioner only points to the ALJ's reference to the October 2013 report of Dr. James, during one of the four hospitalizations, suggesting that Green could get a job or go to school.

Yet Green's hospitalizations would have caused him to be absent from work approximately 40 days out of that year making Green's hospitalization argument something to consider. Indeed, the vocational expert testified that an individual that missed more than one day a month other than sick days, holidays, vacation days, and personal leave would have trouble sustaining competitive employment. Assuming the 40 hospital days did not fall on any holidays, Green would have missed 2.58 days a month from his application date of September 12, 2012, through the date of the ALJ's decision on January 27, 2014, a period of 15-1/2 months. (Doc. 11 at 18, 144). This brings into question what effect Green's hospitalizations would have had on his ability to sustain competitive employment, at least during those 15-1/2 months. While the ALJ need not address all the evidence in his opinion, he failed to connect this seemingly important evidence of absences resulting from hospitalizations to his conclusion that Green could perform sedentary work despite Green's own testimony that he only needed to take one day off each month from work for medical appointments. (Doc. 11 at 51-52).

Once again, however, the Commissioner contends that the ALJ's opinion was supported by substantial evidence in light of Green's noncompliance with treatment. (Doc. 26 at 8) (citing Doc. 11 at 454-55, 502, 519-20, and 548-49). As discussed above, any such reliance on noncompliance is not clear from the ALJ's opinion. As a result, the Court is not persuaded that the ALJ's opinion is supported by substantial evidence in light of the ALJ's failure to address the

effect of Green's hospitalizations on his RFC.  Should the ALJ need to address RFC on remand, he must also evaluate the impact of the hospitalizations.

### b. The Credibility Analysis

Lastly, Green argues that the ALJ improperly relied on the inconsistencies in Green's testimony regarding his overall level of functioning, how often he needed to use the bathroom, and his golf games in finding Green not entirely credible.

As to Green's overall level of functioning, the ALJ pointed out an inconsistency between Green's testimony that it was difficult for him to do everyday tasks, such as walking, doing laundry, and vacuuming, without being short of breath and his later statement during a telephone interview that he could do dishes and laundry and walk half a mile before needing a break. Green seems to be arguing that the ALJ should not have discounted Green's reported symptoms as much as he did.  In his brief before this Court, Green explained his limitations varied and that he reported them as they were when asked. As such, Green claims to have reported significant limitations right after he left the hospital and no problems before hospitalizations.  Indeed, the ALJ could have asked Green for an explanation of the discrepancies, but it was Green's burden to volunteer it.  *See* 20 C.F.R. § 416.912(c).  In any event, Green's testimony about having no limitations provided substantial evidence that he was capable of working, at least a large portion of the time.

Green also challenges the ALJ's discussion of the frequency of Green's bathroom visits. Green argues that the ALJ conflated urination and defecation causing him to find an inconsistency between Green's testimony that he requires eight to nine bathroom breaks a day and his later report of having stools just two times per day.  The ALJ seems to have fully grasped the distinction between urination and defecation; he merely questioned Green's need to use the

16

bathroom eight to nine times a day because he had made no complaint to his doctors. Moreover, only frequent defecation would inhibit work, and the ALJ noted that Green's reports of having stools had "improved" throughout the year.

Lastly, Green contends that his ability to play golf with his dad once or twice a week was not inconsistent with his testimony about his severe limitations because he did not play golf while he was hospitalized and he also testified that he needed to take breaks during activities. Yet these facts, combined with Green's explanations of the inconsistencies cited by the ALJ related to Green's overall functioning as well as his bathroom habits, do not demonstrate that the ALJ's credibility determination was patently wrong. Nevertheless, the ALJ on remand will need to consider carefully the weight to afford Green's testimony about his symptoms should an RFC analysis be required.

## IV. CONCLUSION

For the above reasons, this Court concludes that the ALJ's Step Three analysis was not supported by substantial evidence because it failed to build a logical bridge between the evidence in the record and the ALJ's conclusion. Similarly, the ALJ's failure to address Green's four hospitalizations in the RFC analysis left a gap in the logical bridge between the evidence and the ALJ's RFC of sedentary work. Therefore, the Court now **REMANDS** this case for further proceedings consistent with this opinion. [Doc. No. 21]. The Clerk is **DIRECTED** to terminate this case.

**SO ORDERED**

Dated this 22nd day of November, 2016.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge
